IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOHN SOFRANKO, on behalf of himself )
and all others similarly situated, )
        Plaintiff, )
        )
      vs )  Civil Action No. 06-1657
       )
NORTHWESTERN MUTUAL LIFE )
INSURANCE CO., NORTHWESTERN )
MUTUAL FINANCIAL NETWORK; and )
DOES 1 through 10, inclusive, )
        Defendants. )

## REPORT AND RECOMMENDATION

I. <u>Recommendation</u>:

      It is respectfully recommended that the defendants' motion for summary judgment (Document No. 25) be granted.

II. <u>Report</u>:

      Presently before the Court is a motion for summary judgment submitted by the defendants. For reasons discussed below, the defendants' motion for summary judgment should be granted.

      The plaintiff, John Sofranko, formerly a Financial Sales Representative or Sales Agent for defendant Northwestern Mutual Life Insurance Co. ("NM"), commenced this action to recover minimum wages and overtime compensation which he claims NM wrongfully denied him by mis-classifying him as an independent contractor rather than an employee. In filing this action, the plaintiff seeks to certify a nationwide collective class and a state-wide class of current and former NM Financial Sales Representatives who he claims are entitled to recover overtime

compensation and unpaid minimum wages due to NM's willful violation of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201, et seq. ("FLSA"), the Pennsylvania Minimum Wage Act of 1968, as amended, 43 Pa. C.S.C. § 333.101, et seq. ("PMWA"), and the Pennsylvania Wage Payment and Collection Law, 43 Pa. C.S.A. § 260.1, et seq. ("PWPCL").

Named as defendants in the complaint are NM, Northwestern Mutual Financial Network ("NMFN") -- which NM avers is not a legal entity, but rather, a service mark owned by it -- and "Does 1 through 10, inclusive", described by the plaintiff as unidentified officers, agents or employees of the named defendants who participated in their unlawful acts. The Court's jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1367.

The plaintiff contends that he and similarly situated persons were Financial Sales Representatives engaged in the sale and/or marketing of financial products on behalf of NM; that they regularly worked in excess of forty hours per workweek without any premium for overtime pay because NM wrongfully classified them as independent contractors, thereby denying them the protections afforded under the FLSA, PMWA and PWCL; and that NM willfully violated the aforesaid labor laws by failing to pay them for all hours worked in a given workweek, as well as overtime compensation to which they were due, even though they are not exempt from the requirement of premium overtime pay. Due to the defendants' complained-of acts, the plaintiff seeks a declaration that NM has violated the aforesaid labor laws, imposition of a constructive trust on amounts which NM was unjustly enriched by at his expense, compensatory and punitive damages, statutory remedies, prejudgment interest and attorneys' fees.

The defendants have moved for summary judgment on the plaintiff's claims. They argue that NMFN must be dismissed as an improper party, because it is not a legal entity,

but a service mark owned by NM. With respect to NM, the movants assert that it is entitled to summary judgment, as the plaintiff cannot establish he was its "employee" within the meaning of the FLSA, PMWA or PWPCL, which is a necessary element of his claims.

Summary judgment is appropriate if no genuine issue of material fact is in dispute, and the movants are entitled to judgment as a matter of law. F.R.Civ.P. 56(c); Biener v. Calio, 361 F.3d 206, 210 (3d Cir. 2004).

We agree that defendant NMFN should be dismissed as an improper party. The record shows that NMFN is not a corporation, partnership, or other legal entity; it is a service mark owned by NM (through Service Mark Registration No. 2530436). NMFN is simply a marketing name for the sales and distribution arm of NM, its subsidiaries and affiliates.[1] These uncontroverted facts concerning NMFN are set forth in the affidavit of Donald R. Wilkinson, NM's Vice President of Agency Administration at ¶ 4 (attached to the defendants' appendix in support of their current motion).

In responding to these facts, the plaintiff denies them on grounds that he lacks sufficient information to form a belief as to their truth or falsity, and he produces no evidence in support of his denial. As a result, we agree with the defendants that the plaintiff's response to their facts of record should be treated as an admission to them. That is because a denial based merely on lack of information or belief in a concise statement of fact does not comport with the requirements of F.R.Civ.P. 56(e) or Local Rule 56.1(C)(1), which require that a denial of material fact be supported by record evidence. See, Bouriez v. Carnegie Mellon University, 2005 WL

---

1. See Document No. 41, which is defendants' reply to plaintiff's response to their statement of undisputed material facts at ¶ 3.

2106582, *3-4 (W.D.Pa., Aug. 26, 2005) (holding that "lack of knowledge denials" without support in the record will be ignored, and Court will construe facts of record to be undisputed).

Since NMFN is a registered service mark owned by NM, "it is not a legal entity capable of suing or being sued". See, Erbe v. Billeter, 2006 WL 3227765, *10-11 (W.D.Pa., Nov. 3, 2006) (dismissing insurance company's service mark as a defendant) (citations omitted). Thus, the plaintiff's claims against NMFN should be dismissed, as it is not a proper defendant.

It also appears that NM is entitled to summary judgment in this matter. The record shows that the plaintiff was not an employee of NM, but an independent contractor.

The FLSA broadly defines an employee as "any individual employed by an employer". 29 U.S.C. § 203(e)(1). The Act defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee". 29 U.S.C. § 203(d). To determine if an individual is an employee within the meaning of the FLSA, Courts look to the "economic realities" of the work relationship. Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947).

The Third Circuit Court of Appeals has stated:

[T]he determination of the employment relationship does not depend on isolated factors but rather upon the circumstances of the whole activity... Although neither the presence nor the absence of any particular factor is dispositive, we have held that there are six factors to determine whether a worker is an 'employee': (1) the degree of the alleged employer's right to control the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (4) whether the service rendered requires a special skill; (5) the degree of permanence of the working relationship; [and] (6) whether the service rendered is an integral part of the alleged employer's business.

Martin v. Selker Bros., Inc., 949 F.2d 1286, 1293 (3d Cir. 1991), citing Donovan v. DialAmerica Marketing, Inc., 757 F.2d 1376, 1382 (3d Cir.), cert. denied, 474 U.S. 919 (1985). Courts should also consider "whether, as a matter of economic reality, the individuals are dependent upon the business to which they render service." Id.

The above "economic reality" test is also utilized to determine a worker's status under the PMWA. See, Com., Dept. of Labor and Industry, Bureau of Labor Law Compliance v. Stuber, 822 A.2d 870, 873 (Pa.Cmwlth. 2003), aff'd., 859 A.2d 1253 (Pa. 2004). With respect to the WPCL, "it merely provides a statutory vehicle for employees to recover earned wages from an employer who has breached an underlying contractual obligation to provide such wages." Barvinchak v. Indiana Regional Medical Center, 2007 WL 2903911, *10 (W.D.Pa., Sept. 28, 2007), citing Weldon v. Kraft, 896 F.2d 793, 801 (3d Cir. 1990). Applying the above criteria to the facts presented here, the plaintiff was an independent contractor, not an employee of NM.

The record shows that NM is a life insurance company headquartered in Milwaukee, Wisconsin. It does not directly solicit prospective customers to apply for, or purchase its insurance products; instead, it markets its products through a network of agents whose contracts expressly state that they are independent contractors, not employees of NM. As part of its "network of agents", NM contracts directly with General Agents in different parts of the United States. It is the General Agents' contractual right to solicit applications for NM products within a given territory. General Agents then enter into contracts with District Agents and/or Field Directors who, in turn, enter into contracts with Sales Agents, like the plaintiff.[2]

General Agents run their own businesses and have full authority to recruit, enter

---

2. Id. at ¶¶ 1, 4-7, 11.

into contracts with and terminate District Agents, Field Directors and Sales Agents without NM's input, direction or control. NM endorses contracts that a General Agent executes after completing a background check to ensure there are no legal or regulatory obstacles to an agent selling its products, but NM has no contractual right to terminate such contracts or assign or transfer agents. Sales agents who enter into contracts with District Agents generally are identified as "Soliciting Agents", whereas sales agents like the plaintiff -- who enter into contracts with Field Directors or General Agents -- are identified as "Special Agents".[3]

During the time that the plaintiff worked as a Special Agent (from April 2003 to January 2005), NM's General Agent in Pittsburgh, PA was Charles Ferrara ("Ferrara"). Ferrara had the right to market NM products in southwestern Pennsylvania and in parts of Ohio and West Virginia. In developing his sales force, Ferrara contracted with Field Director Kevin Miller ("Miller"). In April 2003, Miller entered into a contract with the plaintiff, which authorized the plaintiff to solicit applications for insurance issued by NM, and specified that he was an independent contractor, not an employee of Ferrara, Miller or NM (the "Miller contract").[4]

Miller subsequently left Ferrara, and on November 1, 2004, the plaintiff contracted with Ferrara (the "Ferrara contract"). Like the Miller contract, the Ferrara contract authorized the plaintiff to solicit applications for insurance issued by NM, and specified that he was an independent contractor, not an employee of Ferrara or NM. On January 21, 2005, the plaintiff's tenure as a Special Agent ended when he and Ferrara mutually agreed to terminate their contract. The plaintiff admits that his work as an agent was not as productive as he hoped, and he

---

3. Id. at ¶¶ 9, 12-15.

4. Id. at ¶¶ 20, 26, 38, 41, 43, 44.

never achieved the unlimited profits he sought. The plaintiff also concedes that his sales numbers were not satisfactory to himself or to Ferrara.[5]

In <u>Rutherford Food Corp.</u>, <u>supra</u>, the Supreme Court opined that "[w]here the work done, in essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the [FLSA]." 331 U.S. at 729. Thus, notwithstanding the plaintiff's aforesaid contracts which labeled him as an independent contractor, not an employee of NM, we look to the "economic realities" of the parties' work relationship and apply the six factor test recited in <u>Martin</u> above.

<u>(1) The degree of NM's right to control the manner in which the plaintiff's work was performed:</u>

In determining whether NM exerted significant control over the manner in which the plaintiff performed his work, we focus on several factors utilized by Courts in this Circuit, including: whether NM established a rigid working schedule for the plaintiff, or left him free to determine his own work hours; whether it oversaw or supervised his work; whether the plaintiff had an exclusive relationship with NM, or was free to engage in other business relationships with third parties; whether the plaintiff was required to provide NM with sales reports and records or had complete discretion with respect to record keeping; and whether the plaintiff had discretion to hire his own help and pay them. See, <u>Martin</u>, <u>supra</u>, 949 F.2d at 1294, and <u>Bates v. Bell Tel. Co. of PA</u>, 1993 WL 379542, *3 (W.D.Pa., July 13, 1993), <u>aff'd.</u>, 22 F.3d 300 (3d Cir. 1994).

Applying these factors to the facts presented here, it appears that NM did not exert significant control over the manner in which the plaintiff performed his work. The record shows that apart from the plaintiff's attendance at training sessions, he was free to work whenever and

---

5. Id. at ¶¶ 51, 52, 91-93.

wherever he wanted; that he scheduled his own appointments, kept his own appointment book, and decided whether to keep files; that he did not record or report his time; that no one from NM reviewed, supervised or monitored the plaintiff's sales efforts, nor tracked his hours or controlled his activities; that he was free to take vacations or sick time as he saw fit; that he could sell NM products anywhere he became licensed; that he generated his own client lists, no clients were provided to him; that he decided what products to sell to customers; that he was free to sell, and did sell non-NM investment products, such as Franklin Templeton, American Funds and PIMCO mutual funds; that he was free to decide from whom to solicit business, and he chose the time and place of all solicitations; that he decided what approach and style to use to appeal to customers; that the plaintiff incurred and paid business expenses as he saw fit, including for a telephone, fax, postage, copying, office supplies and hiring and paying an assistant; and that the Miller contract and Ferrara contract provided that the plaintiff could sell insurance products of other insurance companies if NM did not offer the product desired, if NM had insured the client to its limit, if NM refused the risk of insuring the prospective policyholder, or if NM quoted rates higher than standard premium rates.[6]

The plaintiff insists that NM controlled the manner of his work, as he was required to attend NM compliance meetings and conferences, participate in mandatory training where he had to memorize sales scripts relating to NM's products, make 40 phone calls a day and set several meetings, and utilize advertising materials provided by NM.[7] In response to these

---

6. See, defendants' brief in support of their current motion at pp. 8, 9, 11 & 17 (with citations to the record therein).

7. See, plaintiff's brief in opposition to the current motion at pp. 4-6, 11-12 (with citations to
(continued...)

8

facts, NM asserts that it did not conduct the plaintiff's training, require his attendance at meetings, or demand that he make any phone calls; rather, Ferrara conducted the plaintiff's training, held meetings at his offices and developed his own sales force without NM's input or control.[8]

As recited above, the plaintiff was not a party to a contract with NM; rather, he was recruited, contracted with, and trained by Kevin Miller and/or Charles Ferrara, and he worked in Ferrara's offices.[9] NM does not control Ferrara or his day-to-day operations. Indeed, Ferrara is independent of NM, and NM has no ownership interest in Ferrara. NM did not assign the plaintiff to work in Ferrara's offices, and it did not exercise control over his day-to-day business or his work schedule.[10]

NM acknowledges that it provided the plaintiff with its advertising materials. However, NM asserts that Pennsylvania law imposes strictly-enforced compliance responsibilities and legal requirements on insurers and agents, including the form and substance of literature an agent may use, how agents may advertise insurance products they sell, and the language an agent is permitted to use with a prospective client.[11] NM insists that requiring the plaintiff to have his advertising material approved and use language that accurately represents the products he sold is not evidence of its control over him, but its compliance with state-mandated requirements that are

---

7. (...continued)
the record therein).

8. See, Document No. 41, which is defendants' response to plaintiff's further statement of material facts at ¶¶ 62, 64 and 93.

9. See, defendants' reply brief at pp. 4-5 (with citations to the record therein).

10. Id.

11. See, defendants' reply brief at pp. 1-2, citing Pennsylvania statutory law.

imposed on the insurance industry.

The plaintiff also cites two agency manuals that NM allegedly provided him titled "The Agent's Manual of Information" ("AMI") and "Agency Models and Procedures" ("AMP"). According to NM, the latter of these manuals, AMP, is a resource for General Agents such as Ferrara, while AMI is a resource for Special Agents.

In support of his position that NM controlled many aspects of his work, the plaintiff cites a provision of AMP which provides: "The company's Agent Contract requires a commitment to being a full-time [NM] Financial Representative." In response thereto, NM reiterates that AMP is a resource for General Agents like Ferrara, not Special Agents like the plaintiff.[12] The plaintiff also cites portions of the AMI which provide that "Phones used for [NM's] business must be answered in a manner that clearly identifies [NM]" and requires NM's approval of certain advertising and sales materials.[13] With respect to the manuals, NM argues that the plaintiff has presented no facts to show that he received the manuals, acted in accordance with them, was disciplined for failing to comport with them, or received any directive from NM with respect to them. Indeed, NM insists that no record evidence indicates that the plaintiff even knew these manuals existed during his tenure as an agent, as he never referred to them in his Rule 26 disclosures or during his deposition. NM also asserts that many portions of the manuals cited by the plaintiff pertain to legal or regulatory requirements that are imposed on the insurance industry and do not evince its control over him.

---

12. See, Document No. 41, which is defendants' response to plaintiff's further statement of material facts at ¶ 41.

13. See, plaintiff's brief in opposition to the current motion at pp. 3-4 (with citations to the record therein).

Based on the foregoing, we find that NM did not control the manner in which the plaintiff performed his work. As discussed above, NM did not establish a work schedule for the plaintiff, and it did not oversee, nor supervise his work. Rather, the plaintiff was free to set his own schedule and had complete discretion with respect to record keeping. The plaintiff generated his own client lists, decided what products to sell them, was free to sell non-NM products to customers, incurred and paid business expenses solely as he saw fit, including hiring and paying an assistant, and could take vacations or sick time as he chose. These facts support a finding that NM did not control the manner in which the plaintiff performed his work.

(2) The plaintiff's opportunity for profit or loss:

The record shows as follows: the plaintiff was paid on a commission basis and received no base salary or draw from NM or Ferrara. The plaintiff's sales activities and expenses were within his control, not NM's, as he determined his business expenses and paid for them, including costs for a telephone, fax, postage, office supplies, and hiring an assistant. The plaintiff also paid for his own transportation, advertising and client entertainment expenses.[14] Thus, we agree with NM that the plaintiff's opportunity for profit or loss depended on his skill in generating commissions and controlling expenses, not on it.

(3) Investment in equipment or materials and his employment of helpers:

As recited above, the plaintiff was responsible for paying all business expenses he incurred as an agent for NM. He also had to generate his own client lists. NM did not provide the

---

14. See, defendants' brief in support of their current motion at pp. 10-12 (with citations to the record therein).

plaintiff with office supplies, equipment, or office space.[15] The plaintiff also paid for continuing education and related instructional materials.[16] With respect to employing helpers, when the plaintiff decided that an assistant might help business, he and another agent interviewed and hired one and paid the assistant's wages.[17] Thus, the plaintiff was financially responsible for the materials required for his work and the employment of helpers, not NM. As the record shows, for all three tax years in which he reported income as an agent for NM (2003-2005), the plaintiff deducted all of his expenses associated with the sale of NM products on as Schedule C (Profit and Loss from Business), not on a Schedule A (Itemized Deductions).[18]

(4)  Special skill of the service rendered:

In Martin, supra, the Third Circuit Court of Appeals stated: "Routine work which requires industry and efficiency is not indicative of independence and nonemployee status." 949 F.2d at 1295 (citation omitted). Here, in order to sell risk products as he did, the plaintiff had to prepare for, take and pass an examination to obtain his Pennsylvania insurance license.[19] To sell variable (i.e., securities-based) products and mutual funds, whether for NM or any other company, the plaintiff understood that NASD Rules required him to become registered with NASD, associated with a registered broker/dealer, and pass specialized Series 6 and 63 examinations to

---

15. See, Document No. 41, which is defendants' reply to plaintiff's response to their statement of undisputed material facts at ¶ 111.

16. Id at ¶ 84.

17. Id. at ¶ 83.

18. Id. at ¶ 89.

19. Id. at ¶ 63.

become licensed to sell such products.[20] In Bates, supra, this Court found that where a plaintiff "obtained his licensure to become a certified state inspector and auto mechanic", his services "required special skill" and were not "routine work", which was indicative of independent contractor status. 1993 WL 379542, at *4. That seems to be the case here, as the plaintiff acknowledged that Special Agents like himself required extensive training due to the complexity of NM products that were sold.[21]

(5) Permanence of the working relationship:

In general, "an employee['s] ... relationship with an employer is continuous and of indefinite duration", whereas "an independent contractor often has fixed employment periods of indefinite work." Bates, 1993 WL 379542, * 4. Here, the Miller contract (which lasted for 19 months) and the Ferrara contract (which lasted three months) were terminable by any party without cause on 30 days' written notice or by mutual consent.[22] The plaintiff worked as a Special Agent for NM for 22 months, after which he and Ferrara mutually agreed to terminate their contract. Since the plaintiff estimates an attrition rate of 90% for new agents in Ferrara's offices[23], there was little permanence or continuity in the work. Still, this factor sheds little light on whether the plaintiff worked as an employee of NM or as an independent contractor.

(6) Whether the service rendered was an integral part of NM's business:

The Third Circuit Court of Appeals has stated:

---

20. Id. at ¶ 64.
21. Id. at ¶ 62.
22. Id. at ¶ 55.
23. Id. at ¶ 45.

> The critical consideration in assessing the integral relationship factor is the nature of the work performed by the workers: does that work constitute an 'essential part' of the alleged employer's business? In other words, regardless of the amount of work done, workers are more likely to be 'employees' under the FLSA if they perform the primary work of the alleged employer.

Martin, 949 F.2d at 1295-96.

NM asserts that the plaintiff's services were not integral to its business, because its core business is underwriting, issuing and servicing insurance and annuity products; that it does not employ a sales force and does not sell insurance from its home office or via the internet; that it does not recruit, assign, promote, transfer or terminate Special Agents like the plaintiff who sell its products; that it does not provide agents with leads, prospects or client lists, nor does it maintain personnel files on them or appraise their performance; and that it markets its products through a network of agents who sell its products.[24]

The plaintiff argues, without citing to the record, that his work in selling insurance products was at the heart of NM's business. As recited above, however, NM's core business is underwriting, issuing and servicing insurance and annuity products.[25] NM does not directly solicit prospective customers to apply for or purchase its insurance products, and it does not sell insurance from its home office or via the internet.[26] NM's products are sold by a network of

---

24. See, defendant's brief in support of it current motion at p. 15 (with citations to the record therein).

25. See, Document No. 41, which is defendants' reply to plaintiff's response to their statement of undisputed material facts at ¶ 2.

26. Id. at ¶ 4.

agents[27], but in performing that sales function, it does not appear that the plaintiff performed the primary work of NM.

In E.E.O.C. v. Zippo Mfg. Co., 713 F.2d 32 (3d Cir. 1983), the Third Circuit Court of Appeals reviewed facts similar to here: where an alleged employer exercised virtually no control over the means and manner of an agent's sales practices, where the agent was a skilled worker who had the right (along with the party whom he contracted) to terminate the relationship without cause on thirty days notice, where the agent was paid a commission as a percentage of sales rather than a salary, where his potential for profit or loss was primarily a product of his own initiative, and where he absorbed all the expenses incurred in his sales efforts. Id. at 38.[28] Under these facts, the Court in Zippo counseled:

> [E]ven if appellants were required to sell only Zippo products, and even if they were economically dependent on the income they earned as Zippo [agents], these factors are not sufficient to establish that they were employees when balanced against the other factors that tend to establish their status as independent contractors... even under the more liberal 'economic realities' standard as applied in FLSA cases.

Id.

Here, having examined the relevant factors in assessing the "economic realities" of the plaintiff's work relationship with NM, we find that he was not its employee, but an independent contractor. Therefore, it is recommended that the defendants' motion for summary

---

27. Id.

28. In Zippo, supra, the Court adopted a "hybrid standard" to determine whether certain individuals were employees or independent contractors under the Age Discrimination in Employment Act. It defined its test as a hybrid of the common law "right to control" standard and the FLSA's "economic realities" standard. 713 F.2d at 35-38.

judgment (Document No. 25) be granted.

Within thirteen (13) days after being served with a copy, any party may serve and file written objections to this Report and Recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

s/ ROBERT C. MITCHELL
United States Magistrate Judge

Dated: November 29, 2007